Judge MANNHEIMER,
dissenting.
I disagree with this Court's resolution of this appeal because I conclude that the information known to the police was not adequate ' to constitute the "reasonable suspicion" that our law requires before the police can remove a package from the stream of commerce and subject it to specialized investigative techniques (like having a trained dog sniff the package).
As explained in the'majority opinion, the trial court relied on a combination of several factors when reaching the conclusion that the troopers had sufficient "reasonable suspi-clon" to justify removing the package from the stream of commerce and having a trained dog. sniff the package for drugs. But as the majority opinion concedes, this information-even considered in the aggregate-was marginal.
The package had a handwritten label, The trooper testified that this fact suggested that the package was probably not a commercial shipment. The person who shipped the package paid FedEx in cash-again, an apparent indication that this was not a commercial shipment..
But these factors merely suggest that the person who shipped the package was not a typical business shipper-that the shipper was an individual who either was running a small business or was using FedEx to ship a package for personal reasons.
The State also relies on the fact that the shipper paid approximately $68.00 to have the package sent "next day air". According to the trooper, this fact was a "pretty significant" indication that the package contained drugs. But the trooper's explanation of this purported significance was illogical, to the point of being nonsensical. Here is what the trooper said:
We know that individuals [who ship] drugs through commercial modes ... often pay cash because the items inside [the package] are more valuable than the money they're [spending] to have a speedy dehv— ery of that package.
Even if we assume that the trooper misspoke-that he meant to say "often ship 'next day aii'" instead of "often pay cash", this purported explanation still fails to support an inference of eriminality-because it applies to anyone who is sending or ordering something of value through the mail or through commercial shippers like FedEx.
No matter what is being shipped (eg., drugs (lawful or unlawful), jewelry, custom auto parts, DVDs, or cosmetics), one can reasonably expect that the more valuable the contents of the package, the less likely it is that the sender or purchaser will balk at paying a higher fee for speedy delivery-since the increase in the shipping fee will be *312 only a tiny percentage of the entire cost of the transaction.
The trooper also testified that the package in this case was suspicious because it was shipped from a "Kink{[o's] / FedEx copy"which the trooper incorrectly identified as "basically a drop-box". The trooper asserted that people who ship drugs will use drop-boxes, rather than transacting the shipment face-to-face with a store employee, because this "helps to further distance [the shipper] from being tied back to the package".
But as the majority opinion explains in footnote 7, the trooper's assertion about a "drop-box" was wrong. "Kinko's / FedEx copy" was the name of a chain of stores. The package in this case was shipped from an office, not a drop-box.
The majority opinion concedes that the foregoing factors, even taken in combination, "would not have sufficed ... to [sufficiently] distinguish the package [in this case] from an innocent package shipped for express delivery from one individual to another."
But my colleagues in the majority believe that these factors became sufficient because of the addition of one final factor: the trooper's conclusion that the person to whom the package was addressed, "Mikey Sheeby", was a fictitious person.
According to the trooper, he concluded that this name was likely fictitious because, when he ran the name "Mikey Sheeby" in the Alaska Public Safety Information Network (APSIN), and in a separate database that records the details of all police dispatches within the Matanuska-Susitua Borough, he found no entry for "Mikey Sheeby", "Michael Sheeby", or "Mike Sheeby". The trooper did verify that the address listed for Mikey Sheeby was a legitimate address (although the trooper found no record of anyone by the name of Mikey Sheeby connected to that address).
My colleagues conclude that the trooper's search of these two databases was a reasonable effort, and that the lack of record for the name "Mikey Sheeby" was a substantial indication that no such person existed.
But the name "Mikey Sheeby" suggested that the recipient might be a child. The trooper had access to the database of persons who had applied for the Alaska Permanent Fund Dividend [1]-a list that was much more likely than APSIN to contain the names of children. But the trooper did not use this database.
The majority opinion nevertheless contends that the absence of the name "Mikey Sheeby" in APSIN is significant because the APSIN database is quite broad. Citing the APSIN annual report for Fiscal Year 2012 (the latest year posted on the Internet), the majority asserts that this database contains over two million person records.[2]
On its face, this figure appears astounding: it amounts to approximately three times the number of people currently living in this state. But this number becomes less astounding when you understand that these two million "person records" are the accumulation of years of data reporting.
For example, APSIN contains the eriminal history records of 825,825 different persons,[3] and these persons have generated records of 1,580,051 separate criminal charges.[4] And the largest portion of APSIN records-slightly under 1,340,000-are based on the issuance of driver's licenses.[5]
Obviously, a search of driver's license ree-ords and criminal history records is not the type of search that is likely to uncover the names of children. The majority opinion concedes as much: it expressly acknowledges that "children and visitors to [this] state are *313 not likely to appear in the [APSIN] database."
But instead of criticizing the trooper for confining himself to these databases when there was reason to believe that the addressee of a package was a child, the majority concludes that the trooper's search of APSIN was good enough.
According to the majority, the trooper in this case was faced with the kind of decision that "(had tol be made quickly", and therefore the law demands only "slight proof". I disagree. I do not know for certain how much longer it would have taken the trooper
to search the list of Permanent Fund Dividend applicants, but there is nothing in the record to suggest that a search of this additional database would have lengthened the trooper's investigation significantly.
* Accordingly, I dissent from the Court's decision to uphold this search.

. See Cooley v. State, unpublished, 2009 WL 2568552, at "1 (Alaska App.2009).

. Dep't of Pub. Safety, State of Alaska, State Central Repository of Criminal Justice Information: Annual Report of Audits and Statistics-For Fiscal Year 2012,(Feb. 15, 2012), available at, hitp:// dps.alaska.gov/statewide/docs/cjis/FY12_Annual. Report.pdf.

, Id. at 13.

. Id. at 31.

. Id. at 16.